Call the next case, please. Mr. Riffle. May it please the court counsel Robert Riffle on behalf of Heartland here today. In a case that I think is very familiar to the court, this case has been consolidated as a result of the most recent oral argument in the case. I'll try to refrain from belaboring the facts as we've already delved into them quite a bit in the prior discussion. I think this case comes to the court in an unusual procedural posture that really, I think, led to the trial court's error in this case, which really brings us to the main point of the appeal today. As the court will recall, it started as a declaratory judgment action on a very narrow question of whether a five-year renewal term automatically occurred, and that's all the parties litigated at that initial juncture. The case was reversed and remanded, and the trial court entered final judgment in that case before, at least from our perspective, before my client ever had a chance to litigate what we think are very meritorious issues, both from a counterclaim standpoint and also from an affirmative defense standpoint. Without belaboring the point, we allege in our counterclaim and affirmative defenses that this property was severely contaminated, so much so that it could not be used for a restaurant. My client was operating a Burger King restaurant there. The property owners tried to sell this to two different restaurant users, both of whom declined, and the correspondence from plaintiff's own counsel to the owner of the adjacent land that was polluting the land states in part as follows, and this is at C-271 of the record. It has become apparent to the Palmers that the environmental contamination has significantly impacted the marketability and value of their property. Despite the recent remedial efforts, the contamination under the building remains. Further, in light of Eliassi's Restaurant Corporation's experience, there is no reason to expect the lender will loan money against this property due to the contamination. That's from plaintiff's counsel saying this property is badly contaminated. They go on to reference vapors in the building, future cost of remediation in the event the building is demolished, and then, this is what I think is really important from a factual standpoint, they proceeded to excavate this property so severely that three-quarters of the parking lot was demolished, and all of the land around the building was remediated, removed. But this is long after you're gone, right? After the client's gone? That's correct, Your Honor. Okay, so I guess the legal question is, so what? I think that really joins the issue, Your Honor. You're absolutely right. My client is being asked to pay, in fact, a judgment has been entered for rent for a period of time that this building was an island that could not be accessed by customers. Vapors in the building made it unsafe for patrons of a restaurant. There's no parking lot. It's a windfall to the plaintiffs to receive rent for a time beyond the time where they've actually excavated the property. We think this would be a trial issue as to what, if any, rent should be received for a period when the property could not be operated as a restaurant, starting with... Hadn't your client already vacated the property? That's correct. Okay, so didn't the lease give them a right to come back in and try to do something with it? They don't have to let it just sit there and chase you for rent? Certainly, certainly. So what if they put a bowling alley in it after your client vacated the property? Well, I think if they had done that by way of mitigation of damages or something along those lines, recall, Your Honor, that at the time this came up on appeal first, we were victorious. The circuit court had declared that we had no further obligation, and then it was remanded under those circumstances. But our point is that they shouldn't receive a windfall from being able to collect rent from a restaurant user at the same time they're telling their neighbor this can't be used as a restaurant because you've so badly contaminated it, it no longer has that use. So our view is that that is a defense. It's commercial frustration. And also, Your Honor, we have alleged a concealment element. If they had told us at the time that they were aware of the severe level of contamination, that this was a dangerous facility, you've got people coming in at a Burger King restaurant who are breathing vapors from underneath the building, as we allege in our complaint, our counterclaim, my client would have vacated the premises at that time. So we allege commercial frustration, but we also allege this concealment, this fraudulent concealment. We allege that they had a duty, because of the danger of this, to apprise us and our customers of the fact that this property really shouldn't be used as a restaurant and that they are guilty of fraudulent concealment for not apprising us at an earlier time. Instead, they're having their cake and eating it, too. At the same time, they're collecting rent from my client. They're telling the neighboring property owner that they ought to pay the full price of a restaurant property because they contaminated it. And so our view is that they've received a windfall by not telling us of the true nature and condition of the property. So, at a minimum, Your Honor, we look at this from a 2615 standpoint, that we believe we've alleged facts which, if taken as true, give us the right to at least proceed to try to prove our allegations of the fraudulent concealment, of the commercial frustration, and the other things we've alleged in the complaint. So, you're saying the fraudulent concealment, frustration, etc., had you known of that while you were operating the business, that you would have taken action to vacate the premises? Absolutely, Your Honor. We allege that very specifically in the proposed complaint. Our view is, we thought at that time that we had one good reason to vacate, that being that we were no longer subject to the lease, and we've been aware of that. I'm quite certain that the notice would have said, one, we don't think we still have any obligations under the lease, as was first found by the circuit court. But two, we now know that this property cannot properly be used as a restaurant, and that would have either been the first or second grounds for termination, but it certainly would have been a grounds for termination at that time. My client would have never, as a franchisee of Burger King, being apprised that petroleum vapors are coming up through the floor, would have immediately vacated the premises or taken actions to protect its clientele. Refresh my recollection about the first appeal. It was a declaratory action, and the trial court declared that the clause was not enforceable? Right, that it didn't automatically roll over, that the lease was validly terminated, and then it came up on appeal, and in a 2-1 decision, it came back saying, yes, you are obligated for an additional five years. So just the declaratory action, summary judgment, in favor of plaintiffs saying the clause was enforceable, doesn't resolve anything other than the clause was enforceable? That's our point exactly, Your Honor, and so when it came to remand, the trial court felt, I believe, that they had a mandate that said, you must enforce this for five more years. Did the first opinion direct the trial court to find on the merits? No, Your Honor. I think the trial court... Because I think I was a dissent in that case, so probably didn't focus on... And I think the trial court was confused with all due respect to the trial court. I think the trial court read the mandate saying, okay, this case came back, it's five more years, and in fact, the plaintiffs sought five more years in their petition for further relief after this came back, having already sold the property. When the directive is, it's enforceable. Now, go forward. Right. So the mandate did reference that five-year period, but our point is, we never had the opportunity during the original case, while it was just a declaratory judgment action on that narrow issue of the lease extension, there was no opportunity and really no reason for us to have asserted all of our defenses at that time, and quite frankly, we were not aware of the nature and extent of the environmental problems until after the fact. If the declaratory action had been decided the other way, and affirmed on appeal, that it was unenforceable, ends the litigation between the parties. It's definitive. It's unenforceable, everybody goes their separate ways. Correct. And this goes, as you said, when your client vacated the property, you were unaware of any problem with it, right? My client was unaware of the nature and extent. My client did have some notice that there was some testing in the nearby vicinity, but we had no idea. But that wasn't the reason they vacated the property. Absolutely not, Your Honor. And again, so, I guess what I'm trying, if, maybe the both, what if the owners had then, after that, decided, I'm going to give this to the Moonies, and tore everything down, put a teepee in the middle of it. You can't use that as a restaurant. Then, could you come in and say, well, they can't collect rent for us from a restaurant because it's no longer suitable to be a restaurant. Well, they made an alligator farm. That's not hospitable to restaurant people. So, what if they had done that? But the main thrust of our counterclaim, or at least one of the main thrusts, is this fraudulent concealment. That if you are the owner of a property that's being used for restaurant purposes, and you find out that vapors are coming through the concrete floor, that at that point you owe a duty to your tenant to apprise them of that, and they have a right to vacate at that point. Had we known of that, had they not fraudulently concealed that information, we could have availed ourselves of termination rights in addition to what we thought we had. Well, did you plead that those vapors were coming through the floor when your clients owned the place? I believe that's correct, Your Honor. Or it was just something that was found out after your clients were gone. And because vapors were coming through the floor on the 16th of December of whatever year, doesn't mean they were coming through the floor in January, does it? Yeah. But, Your Honor, I think that's a discovery issue. I mean, I think we're very deep into the merits of this case at that point. From a 2615 standpoint, we allege specifically that they knew about it, they had a duty to apprise us of it, and they didn't. And had they notified us, we would have taken action. Now, we understand it's still our burden of proof in that regard. We conducted some third-party discovery. The way we found out about most of this was third-party discovery vis-à-vis the purchaser of the property. We believe that to be the case. Well, I mean, would it be unreasonable to turn the tables and say maybe, when we're talking about windfalls, that maybe it's your client looking for a windfall. They left the property for reasons that had nothing to do with the condition of the property. And then later they find out about something that they think is a condition of the property and say, Aha, we don't have to pay any rent for that time we were due under the contract. So, if you look at it that way, who's getting the windfall? But, Your Honor, I think that the party that was in a position to do anything about this, we're not in privity with, we're a tenant, we're not in privity with the offending neighboring landowner, the property owner, at that point, had the ability to realign those commercial expectations. We're the ones that have no remedy at all. We're stuck with something that never could have really been a good performance, counterperformance by the lessor, and we're left with no remedy against anyone else. They're in a position where they threatened and could have proceeded with a lawsuit. If they didn't get their number from PKM, the offending party, they could have taken legal action. We, as a tenant, were not in a position to take that action. So, I think the way the risk and reward should be allocated would be... I don't know, if you're a leasehold interest in property and somebody damages the property to the extent that it reduces or obviates your beneficial use of the property, then you probably still have an action against them, but... But the party that made the threat and pocketed the money was the landlord, and they suffered no bad effects of this, and they continue... If the judgment is affirmed here, they're going to be paid rent for a period when the building sat as an island and could not have been used. They are getting rent for something that had no usable value at that point in time. But, whatever happened there didn't keep your client off of the property, because your client already packed their bags and left town, right? I understand your point, Your Honor, but again, the fraudulent concealment aspect of it, they should not benefit from knowing that there's a problem, keeping that information to themselves, benefiting, walking out with full value for that property, and to, you know, with my client left. You're not asking us to reach that issue, though. You're just asking us to send it back so you can address that issue. Absolutely, Your Honor. We just, from a 2615 standpoint, want the opportunity to plead that, we understand that we still have the burden of proof on those points, we think we can achieve that, but our client's feeling is we've been deprived of our day in court because we've never had that chance to go and assert that, and we have conducted, again, limited discovery, but to conduct discovery and to try to prevail on that issue. Thank you very much. Mr. Walton. Good afternoon. May it please the court, counsel. Your Honor, Mr. Justice Schmidt, you are on to a key issue here. The claims, the counterclaim, and the affirmative defenses that were stricken fail as a matter of law. Any way you slice it, they fail as a matter of law, and I'm going to tell you why. Have they told the trial court why? Absolutely told the trial court why. Did they rule on that? He did. Issued an order striking the counterclaim and affirmative defenses. They came back with a motion to amend. Tried to re-plead. Was that order issued while the first appeal was pending? Nope. It was after the mandate issued. The Supreme Court denied the PLA. The mandate came back down to the trial court. The trial court entered judgment per the mandate and heartland appealed. That was the second appeal in this case. Then we proceeded. They pressed the counterclaim and affirmative defenses, filed a motion to strike. The judge granted that. While the second appeal was pending? While the second appeal was pending. Why wasn't that motion stayed pending the outcome of the second appeal? That's a good question. There wasn't grounds for a stay. They asked for a stay, but there was no basis to stay. They continued proceedings. So, getting to the legal reasons why the counterclaim and affirmative defenses failed. It's because, in a simple word, it's a matter of timing. They left the property. They abandoned it. They chose to abandon it. And I'm not getting to the merits of an unlitigated issue when I point out the judicial admissions that Heartland made in this case. Chief of which is an admission in response to the complaint for additional relief on remand after the declaratory judgment was resolved, wherein they admit that they left the property. They abandoned it in December of 2009. So that's not an issue. But we also know from an affidavit that they filed in the declaratory judgment action, affidavit of the Heartland broker, James Millen, we know exactly why they left. They left because they made the business decision that this Burger King was underperforming. They didn't leave because of environmental contamination, even though they were fully apprised of that four years before. They left because, in his words, Heartland, this is a quote from the record C-148, Heartland determined that the restaurant's performance did not warrant remaining at the property or requesting that Burger King extend the franchise agreement. Now, the counterclaim, as counsel just indicated, is alleged to be based upon this notion of fraudulent concealment. This is a triple net commercial lease. The landlord has nothing to do with the property anymore. The landlord, they're here today, we're at the Phyllis Palmer. They live in Ottawa. They don't know what's going on down in Peoria at the Burger King. Okay? Who does? The tenant. They open up every morning and they close every night. They know what's going on. Now, that's the reality, but from a pleading perspective, the reason why fraudulent concealment fails, because they don't allege that the Palmers knew about the contamination until long after they packed their bags and left. How do we know that? Because they attached a letter. It was my letter. They attached it to the counterclaim. And they say, this is the basis for our contention that there are vapors in the building. And that letter makes it very clear that the Palmers learned about this for the first time after Heartland had left the property. And they tried to sell the property, as they're required by law to do. And the buyer performed due diligence, as buyers are required to do. They looked at it. They wanted it. The bank said, no loan. There's environmental contamination. Found another buyer. Same thing. No loan, environmental contamination. Banks in this environment are afraid of environmental contamination. Not surprising. So it's that knowledge, the first knowledge that the Palmers gained of this alleged severity, and it is just alleged. So that was when they were trying to sell the property after it had been vacated? After it had been vacated. And we know that. So basically they're trying to mitigate damages. And they're trying to mitigate damages. So file this under the, you know, no good deed goes unpunished. Because I will tell you, I've had many cases where I represent landlords and they're accused of not having done enough or not having done anything to mitigate damages. Never before have I had a landlord who's been punished for actually mitigating damages. Now, this whole windfall notion, is there? Is this not a relatively simple case? It's a very simple case, Judge. So your view is that they're arguing they were constructively evicted when they weren't on the premises?  To be constructively evicted, you have to have been in possession and be dispossessed by something the landlord did. But you're saying they were never in possession at the time? They weren't. Same goes with commercial frustration. Look at all the commercial frustration cases. The zoning case. The tenant could not occupy the property for the purpose of the lease. Okay? And here, we don't have that. After they've already abandoned the property and are no longer in possession, they say, Aha, now we've got an excuse to not pay rent. And so let's call it commercial. In their effort to characterize it as a cognizable defense, they come up with commercial frustration. Well, the building didn't burn down while they were occupying it. The zoning department didn't come in and put a closed sign on the door and board it up while they were occupying it. This all came up after they had left. And Your Honor was right. Again, getting at the fundamental rights and obligations of a landlord, once the tenant abandons the property, the landlord has the right to retake possession. With that right comes the duty. The duty to mitigate. And does Hartland really want this court to believe that it was wrong for the landlord to fix the property? To clean up the mess? Because they say, well, after we left, we wouldn't have been able to get to the building because it was torn up. They tore it up while they were doing the remediation. Well, of course, any landlord who's exercising its obligation to mitigate damages is going to fix the property up as best they can. Now, imagine, to the extent that this windfall argument has any support at all, imagine the typical scenario. The landlord finds a new tenant. The rent under this lease was about $5,000 a month. Suppose they did find a bowling alley, as Your Honor brought up, and they're willing to pay $3,000 a month. Imagine the insult to the former tenant. They're paying rent, albeit only the difference to $2,000 a month, while somebody else is in their property. That doesn't seem very fair. But it happens every day when a tenant defaults under a lease and leaves before the term is up. So here you have the situation where Hartland made a business judgment. They gambled. Business people do it all the time. They gambled that they were going to win the declaratory judgment action. And they left. Well, they didn't. They didn't win. And, you know, they act surprised now that the Palmers came back and asked for rent. Well, you know, first of all, it's perfectly within the statute. The Civil Procedure Act 2701C says, you know, once the declaratory judgment is entered, if further relief is appropriate, you're entitled to it. So that's all this is. It shouldn't have been a – but what did Hartland expect? That the Palmers had brought this declaratory judgment action as a purely intellectual exercise? You know, obviously they wanted to impose obligations on the tenant for the, you know, additional option term of the lease. And because they prevailed in the declaratory judgment action, that means the tenant had that obligation to pay rent. So getting back to the defenses, as a fundamental premise of landlord and tenant law, what types of defenses work? What types of defenses would allow a tenant to escape its otherwise obligation to pay rent? Well, we talked a little bit about constructive eviction. That doesn't work here because they were not dispossessed of the property. They voluntarily left before anybody knew about this environmental contamination. They've tried to plead unclean hands. I think in my brief I explained that can't work in an action at law on a contract. That only works in an equitable action. Again, you know, commercial frustration, same sort of thing. But one thing that I would like, that struck me while I was listening to counsel's argument, that I would really like the court to think about, Article V of the lease, it's a triple net lease, so this shouldn't come as a big surprise, but it's critical here. Article V of the lease imposes all of the maintenance obligations on the tenant. So really, if the environmental contamination had been discovered while Hartland was still in possession of the property, it's Hartland's obligation to clean it up. All of the maintenance is their responsibility, and yes, they absolutely, as a leasehold, interest holder in the real estate, they absolutely have a right to sue McDonald, the shelf station owner next door. They absolutely have rights of action against the contaminator, but the lease specifically says unless the landlord himself causes the damage to the property, it's completely the tenant's responsibility. Well, let me, and I'm gathering part of his argument is in the concealment, is that well, yeah, and maybe would have done that, would have stayed in there and sued them, but the landlord knew about this and didn't tell us about it. Right. If he had alleged that the landlord knew about it before we left, before we voluntarily walked out and surrendered possession, it would be a different story. But they didn't. They alleged the landlord learned about this months after we left, four or five months, during the process of selling the property, and they made that allegation very specific and they attached the letter that allegedly gives rise to the knowledge on the part of the landlord, and it's clear from the pleading itself. That's why it's a 615 motion. It's clear from the pleading itself, and they're bound by their own pleading. Well, you don't dispute that anyway, do you? We don't. Okay. Of course not. It's not a factual issue. It's not a factual issue, but again, I'm not just saying, I'm not coming up and offering evidence in response to a 615 motion. I'm saying this is in the four corners of the pleading itself because they attached it as an exhibit. So this is a classic example, no set of facts that they could plead based on this newly discovered environmental contamination, the newly discovered scope of the environmental contamination, could possibly give rise to a cognizable defense. I'm having some trouble with your analysis, and maybe I'm just a little dense. Justice Schmidt gives you an example of they mitigate damages by going out and putting a bowling alley there or renting to a bowling alley. Sure. That didn't happen. They didn't find a tenant and mitigate damages until 2014. They sold the property, making the option period impossible. It's gone. The property's gone. The property is gone. It's owned by somebody else. Exactly. So the question is, between the time that they stopped paying rent and the time the mitigation occurred. How can the landlord, if the landlord wants to enforce the option, how can he then sell the property? Because he has a right to terminate the lease. Just like the new tenant would necessarily prevent the old tenant from continuing to possess the property, the new owner prevents the former tenant from continuing to possess the property. But that's not a problem here because the tenant voluntarily relinquished that possession. So the tenant, Hartland in this case, no longer had a possessory right under the lease. That doesn't mean that it's obligation to pay rent abated. It's just it no longer had a possessory right. And that's why all of these facts that they, you know, are listed. Let's talk about that obligation to pay rent. For what period of time did they have an obligation to pay rent? Well, for the entirety of the renewal term, which was five years, subject to the mitigation. So at the time that this court ruled on the declaratory judgment action and that the property hadn't been sold, we don't know how long it would be. In theory, it could be up to five years. Okay. So that's what I, obviously. It's an unknown. Okay. At this point. But now we've cut it off. Now it's a very clear known fact. It's a date certain, October 25, 2010, the date that the property was conveyed. Right. Sale of the property. Sale of the property. Absolutely cut off. Any further right to rent. I don't have anything further. Thanks. Okay. Thanks, Mr. Walton. Mr. Ripple for rebuttal. Yes. I heard Mr. Walton say that if we had alleged in the complaint they knew about it before we left, that this would be a different case. Well, this is a different case. I think we've gone far afield of the allegations of the counterclaim here. I'm looking at paragraph 14, page 3 of our counterclaim. On information and belief, the Palmers were aware of the extent of the contamination and of the fact that the demise premises were unsuitable for use as a restaurant at least as early as December 2009, the date that Heartland vacated the demise premises. That's our factual allegation that they were aware of that before. We proceed in paragraph 15. The Palmers did not notify Heartland of the fact that the demise premises could not safely be used as a restaurant. We go on elsewhere. Well, if they only knew about it the day your client left, you believe that they knew about it the date that Heartland vacated the demise premises? That's what we're saying here. Well, that's at least, isn't that one day too late? At least as early as that date. We're saying that we believe they knew about it prior to us vacating that premises. We then proceed, pursuant to section 1-109 of the Code of Civil Procedure, to provide a verification that supports that information and belief allegation. That's our case. Our case is they knew about it. They fraudulently concealed that fact. So you're saying let's get away from the at least as early as December. That language is a little bit problematic. But you're trying to say an ordinary term, ordinary language. They knew about it when you were in possession, operating the restaurant. Correct. That way I think everybody understands what your allegation is. Certainly. It could have been more artful, but there's no doubt about it. We're alleging in this complaint they knew about it before we left. If we had been turning to 23 and 24, we allege this affirmative duty that they had to notify us that it was unsuitable as of the time they came to that conclusion and that they concealed this fact. And then in 24, if Heartland had been informed of the nature and extent of the contamination and the fact that the property could not have been safely used as a restaurant, Heartland would have terminated the lease on grounds related to the environmental contamination. That's our case. Okay. Now let me ask you this. Did you say that, and that's kind of conclusory, but you have evidence of that, right? Right. That they knew it. Right. And we have an affidavit or a verification that supports those information. We only allege one of the multiple paragraphs on information, I believe that's paragraph 14, but we've complied with 1-109 to provide a verification that says, except those matters stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true. So, again, we're really here on an appeal of a 2615 motion where we have these allegations. They're supported by our verification. We've done what we're supposed to do to support those allegations. We believe it states a valid cause of action for fraudulent concealment. Proof will, if we're allowed, this case is reversed and remanded. We have the burden to back up this verification. How long had you all been, your client, been in this building before? I mean, five years? It was longer than that. I don't know the exact. It would have been the full initial term. And I suppose this is factual. I don't know, but the point that if there was contamination, in other words, if the gas tank in the gas station next door leaked, and it made it unsuitable, that would have, in essence, been your client's problem in the sense that they remediated, soothed the torque piece or leaked their gas on their property. So what benefit did, and you might tell me that this is a factual issue to decide to lower something, I suspect, but, in other words, I'm just having a hard time figuring out why anybody would do that. It's a little counterintuitive. Would do what, Your Honor? Well, in other words, if you were the leaseholder and the lease required you folks to pay for any damage to the property, and then the headache would fall on your client then to either fix it and then sue the guy next door to recover your damages, you know, if they did something. No different than, let's suppose a guy drove a semi or a, were imperious, so let's have a D11 do that thing and took the building right off the foundation, whose problem would it be? Do you get a not-to-pay rent or do you have to rebuild the property and sue the guy with the D11? I honestly don't know the answer to that in this particular case. It wasn't briefed by anybody. It is a factual issue at the end of the day. I highly doubt that my client... Although it is kind of an issue as to whether or not that D11 coming through the property would, and obviates from a legal point, obviates your client's duty to pay rent. And does that fall on the landlord or does it fall on you? And then you've got to go out to the tort-feeser, and that seems to me a perfectly clear legal contractual issue which would address whether or not your affirmative defense or, as you call it, a counterclaim has any legal merit. And, Your Honor, I think that's a fascinating issue that the trial court didn't address, neither party addressed, until Mr. Walton first raised it here. And I don't honestly know the answer to that. I don't believe that my client, unless he had an obligation that would extend that far to remediate environmental contamination caused by an off-site property owner. I do believe that to the extent that the Palmers knew about this, the nature and extent of the environmental contamination, it's still a disaffirmative duty to apprise my client, who's in the restaurant business, so that they don't have the public coming in there and being exposed to environmental contamination. So, again, Your Honor, I think from a pleading and proof standpoint, I think those are issues that could come up in the course of the discovery and maybe on a summary judgment. Somebody could come in and say, here's why that doesn't work. But from a pleading standpoint, nothing like that has come up in defense of our pleading. I think on the face of it, it pleads a cause of action, and I think we should have been allowed to proceed with that. With all due respect, we request that the court reverse and remand this case to give us that opportunity to litigate the case. Thank you very much. Thank you, Mr. Riffle, Mr. Wall. And thank you also. We will take this matter under advisement that this position will be issued, and we'll be in a brief recess for a few minutes for a panel.